NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190195-U

NO. 4-19-0195

IN THE APPELLATE COURT

FILED
September 14, 2020
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| GRANVILLE S. JOHNSON, | ) | No. 08CF1424 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed and remanded for further first-stage postconviction proceedings, concluding defendant set forth a claim in his supplemented motion to reconsider which was neither frivolous nor patently without merit and, therefore, the circuit court needed to determine whether defendant's postconviction counsel was aware of the claim and refused to include it in defendant's postconviction petition.

¶ 2    Defendant, Granville S. Johnson, was convicted of first degree murder and attempt first degree murder. His convictions were affirmed on direct appeal. Through private counsel, defendant filed a petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2012)). The circuit court summarily dismissed defendant's petition. Defendant filed a *pro se* motion to reconsider, which he later supplemented. The circuit court denied defendant's supplemented motion without considering his assertion that

postconviction counsel provided "ineffective" assistance for failing to include certain, previously-requested claims in his petition.

¶ 3　　　　　Defendant appealed, arguing the circuit court erred by not considering whether his counsel's representation was "unreasonable" for failing to include the *pro se* claims from his supplemented motion to reconsider in his postconviction petition and by summarily dismissing his petition because at least one of the claims he would have raised had counsel not provided unreasonable assistance stated the gist of a meritorious claim. *People v. Johnson*, 2017 IL App (4th) 160449, ¶ 2, 79 N.E.3d 200. Based on the statutory language, the persuasive authority from our sister districts, and the absence of a clear ruling on the issue by the supreme court, we held a prisoner is not entitled to reasonable assistance at the first stage of postconviction proceedings and, therefore, defendant's arguments grounded in such an entitlement failed. *Id.* ¶¶ 35-43. The supreme court reversed, concluding, based on the nature and purpose of the Act, a prisoner who retains private counsel is entitled to reasonable assistance at the first stage of postconviction proceedings. *People v. Johnson*, 2018 IL 122227, ¶¶ 14-23, 123 N.E.3d 1083. The court remanded for the circuit court to reach the substance of defendant's supplemented motion to reconsider. *Id.* ¶ 24.

¶ 4　　　　　On remand, the circuit court, after receiving from defendant a second supplement to his motion to reconsider, entered an order denying defendant's supplemented motion, finding each of the *pro se* claims raised therein meritless. Defendant appeals, arguing this court should reverse and remand for second-stage postconviction proceedings because he pleaded the gist of a constitutional claim that (1) his trial counsel provided ineffective assistance by failing to object to portions of a police officer's trial testimony which lacked a sufficient foundation and amounted to hearsay, (2) his appellate counsel provided ineffective assistance by failing to raise under the first

prong of the plain-error doctrine, a violation of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), and (3) the State violated his right to due process when it knowingly used a police officer's false testimony to obtain his convictions. For the reasons that follow, we reverse and remand for further first-stage postconviction proceedings.

¶ 5                                        I. BACKGROUND

¶ 6        Between May and August 2009, defendant was tried before a jury on three occasions for the first degree murder of Gregory Moore and attempted first degree murder of Isaac Moore. During the first two trials, the juries were unable to reach a verdict, and mistrials were declared.

¶ 7        At the third trial, the trial court asked the potential jurors during *voir dire* whether they understood each of the principles set forth in Rule 431(b): (1) that defendant was presumed innocent of the charges against him; (2) that the State was required to prove defendant guilty beyond a reasonable doubt; (3) that defendant was not required to offer any evidence; and (4) that a decision by defendant not to testify could not be held against him. The court did not, however, ask the potential jurors whether they accepted the Rule 431(b) principles.

¶ 8        The jury heard from three witnesses who were allegedly present during the events that resulted in the death of Gregory and the injury of Isaac. Those witnesses included: Isaac, Anthony Jamerson, and Amandrae McGill. The jury heard from the three witnesses in different manners. Isaac provided his account through live testimony. While Jamerson was present, he testified to having no recollection of the relevant events and, therefore, the jury heard Jamerson's account through an audio and video recording of an interview in which he participated shortly after Gregory's death. McGill was declared unavailable prior to trial. The jury heard McGill's account through audio recordings of the testimony he provided at defendant's first two trials. Except for

the identity of the perpetrator and Jamerson's location at the time of the relevant events, the witnesses accounts were largely consistent with each other and corroborated by the physical evidence from the crime scene.

¶ 9 The testimony and evidence established the following. On the evening of July 30, 2008, Gregory, Isaac, and McGill drove in a van to a residence located on Roper Street in Champaign. Gregory drove the vehicle, Isaac sat in the front passenger seat, and McGill sat in the rear seat behind Gregory. Upon arriving at the residence, Gregory went inside with defendant, while Isaac and McGill waited in the vehicle. According to Isaac and Jamerson, Jamerson then approached the passenger side of the vehicle and a conversation commenced. According to McGill, Jamerson never approached the vehicle. Gregory returned to the vehicle and entered the front driver's side door. Moments later, a male appeared and placed a gun through the front driver's side window and began firing. Both Gregory and Isaac were struck by bullets. Isaac and McGill fled from the vehicle. Isaac was struck by a second bullet while fleeing. Gregory died from the injuries he sustained.

¶ 10 Isaac, Gregory's cousin, testified he had "[n]o doubt" in his mind defendant was the shooter. Isaac indicated he observed defendant outside by the front driver's side of the vehicle moments after Gregory returned to the vehicle. Isaac indicated it was light enough outside where he could see defendant's face from where he was seated. A police officer who later responded to the scene testified to observing the van parked under a streetlight pole, which was illuminated and shined over the front of the vehicle. Isaac testified he was unable to describe the gun because it was dark and because he was not expecting there would be a gun until shots were fired. Isaac also did not recall what the shooter was wearing. Isaac testified he was familiar with defendant's appearance as he had previously spent time with him and Gregory. Isaac acknowledged being

- 4 -

"high a little bit" from smoking "weed" when they arrived at the residence on Roper Street.

¶ 11         Isaac testified he had no animosity towards defendant before the shooting and he was not aware of any animosity between Gregory and defendant. Isaac acknowledged Gregory had introduced him to defendant and told him that he and defendant "grew up together, and they were friends when they grew up."

¶ 12         Isaac acknowledged Gregory had been a police informant. Isaac also acknowledged both he and Gregory were the victims of a shooting in 2007, and no one was arrested for the shooting.

¶ 13         Isaac acknowledged having been convicted of unlawful delivery of a controlled substance and sentenced to a term of probation. He also acknowledged a petition to revoke his probation was pending because he allegedly committed the offenses of obstructing a peace officer and theft.

¶ 14         Isaac did not recall speaking with police officers after the shooting. One officer who responded to the location where Isaac had fled testified Isaac, despite appearing motionless, out of breath, and in pain, was able to identify the location where he was shot and who else had been shot. The officer also testified Isaac identified defendant by his nickname after being asked two or three times for the identity of the shooter. Another officer who responded to the location where Isaac had fled testified Isaac "just shook his head or nodded his head" after being asked for the identity of the shooter. A detective who met with Isaac at the hospital testified Isaac, despite having some difficulty speaking, identified defendant by nickname as the shooter.

¶ 15         In April 2009, Isaac, at his own initiative, met with defendant's attorneys and told them he was not certain of the shooter's identity. Isaac testified he lied to defendant's attorneys because he was concerned with what could happen to his family. A witness who observed the

meeting between Isaac and defendant's attorneys testified Isaac appeared comfortable at the meeting and explained he (1) "used a comfortable amount of weed" the day of the shooting which caused him to hallucinate and not realize he had been shot; (2) was "not sure" of the shooter's identity, and (3) previously implicated defendant to the police because that was the last face he observed on the driver's side of the vehicle.

¶ 16　　　　On August 9, 2008, Jamerson was interviewed while he was in police custody on a parole violation. Jamerson identified defendant as the shooter. Jamerson also reported defendant, after the shooting, hollered, "the hood should be happy." Jamerson identified defendant as the shooter only after the detective conducting the interview suggested Jamerson was involved and evidence existed indicating Jamerson was near the van. Prior to that, Jamerson reported he was not on Roper Street at the time of the shooting and he had heard "Mexicans" shot Gregory.

¶ 17　　　　Jamerson testified he knew defendant "from the streets" and considered him to be an "[a]cquaintance." Jamerson testified he also knew Gregory and Isaac. Jamerson acknowledged he had a pending domestic battery charge and prior convictions. The defense later introduced certified records of Jamerson's convictions for obstructing justice, theft with a prior theft conviction, attempt unlawful possession with intent to deliver a controlled substance, and escape.

¶ 18　　　　McGill testified he "knew for sure that [defendant] was not the shooter." McGill indicated the shooter approached the van from the rear which allowed him to see the shooter's face as the man passed by the rear driver's side window. McGill also saw the shooter place the gun through the front driver's side window and start firing. McGill acknowledged Gregory's head and a pillar of the vehicle were in front of him but maintained his view was not obstructed. McGill testified he was unable to tell if the shooter was black or Hispanic. McGill acknowledged he was able to give a detailed description of the gun and the clothes the shooter was wearing. He explained

his focus was on the shooter's gun and clothing more so than his face. McGill testified he was familiar with defendant's appearance as he had seen defendant "around" and knew him as an "acquaintance."

¶ 19        The day after the shooting, McGill voluntarily spoke with police officers about the shooting. McGill testified he was shown a photographic lineup which included photographs of defendant and "a couple of other people [that] [he] kn[e]w." McGill reported not recognizing anyone in the photographs as the shooter.

¶ 20        McGill confirmed he was closer with Isaac and Gregory than he was with defendant, and he wanted the person responsible for the shooting "brought to justice." When asked why he previously told defendant's attorneys that he knew the shooter was not defendant, McGill said:

> "Because I know him from around when I be outside and when people was saying that he was the one that was locked up and whatever I was like it's not him. The wrong person. So I went up to them and told them that you basically got the wrong person."

¶ 21        The police seized tan boots and a shirt worn by defendant. A blood stain was detected on a boot, but the stain did not contain enough information to either exclude or imply any positive associations with Gregory, Isaac, or defendant. A blood stain was also detected on defendant's shirt. The stain was associated with defendant. The gun was never recovered.

¶ 22        Police Officer Jason Yandell, a State's witness, testified on direct examination about Gregory's participation as a police informant in "numerous cases." At one point, Officer Yandell became "extremely concerned" for Gregory's safety as "his name had gotten out on the street in the drug community as working for the police." Officer Yandell testified he was concerned

with the possibility someone might cause injury or death to Gregory, particularly because they "were dealing with quite a few people at the time." Because of that concern, Gregory and Isaac moved to Indianapolis for a period.

¶ 23 On cross-examination, Officer Yandell testified Gregory had worked as an informant for about a year and a half, excluding a period from about November 2007 to the Spring of 2008 when Gregory was in Indianapolis. As an informant, Gregory would provide information and participate in the controlled purchases of illegal drugs. Officer Yandell acknowledged there were "a number of occasions" when he gave Gregory between $250 and $750 to purchase drugs. After returning from Indianapolis, Gregory was paid for information he provided approximately two times. He did not, however, participate in any controlled purchases after his return.

¶ 24 The defense reviewed with Officer Yandell "some of the actual cases that Greg[ory] helped on." In July 2007, Gregory gave information about an individual named Brandon Baker, which led to the seizure of "substantial amounts of crack and cocaine," as well as a gun. The Baker investigation further led to information about an individual named Fidel Garcia, who allegedly sold Baker cocaine. In August 2007, Gregory gave information and participated in several controlled purchases of cannabis from an individual named Edmundo Alvarado. In October 2007, Gregory gave information that led to the purchase of drugs from individuals named Norberto and Octaviano Sanchez. The Sanchez investigation led to the seizure of approximately 1200 grams of cocaine and $37,000. Following the Sanchez investigation, Officer Yandell learned Gregory's name "might be out there on the street" and suggested Gregory and Isaac leave town for a while as he was concerned for their safety. Officer Yandell gave Gregory and Isaac funds through the police department to help cover relocation expenses.

¶ 25 On further cross-examination, Officer Yandell described an incident occurring in

July or August 2007 where a known drug dealer named Otis Powell followed Gregory's vehicle, as well as a police vehicle, after a controlled purchase. Shortly thereafter, Officer Yandell learned Powell encountered Gregory and Isaac at a bar and shot them.

¶ 26      On redirect examination, the State inquired about the individuals the defense had referred to on cross-examination:

> "Q. Now the individuals that you discussed with [defense counsel], Mr. Baker, and Mr. Garcia, Mr. Alvarado, and the two Sanchezes, to your knowledge did any of those individuals ever learn by any means the identity of Gregory Moore?
>
> A. No, they did not."

The State further inquired:

> "Q. And in fact several of those individuals were actually in custody at the time that Greg Moore was killed; is that correct?
>
> A. That's correct.
>
> [DEFENSE COUNSEL]: Objection, basis of knowledge.
>
> THE COURT: The objection to foundation is sustained. The last answer will be disregarded.
>
> Q. Okay. At the time that Gregory Moore was killed, were you aware of whether several of those individuals, Mr. Baker, Mr. Garcia, and Mr. Alvarado and the Sanchezes were actually in the custody of a law enforcement agency?
>
> A. Yes, they were, other than Octaviano Sanchez, who we learned fled back to Mexico."

¶ 27    The State questioned Officer Yandell if he was concerned about any individuals who may have known Gregory's identity as an informant, to which Officer Yandell identified Powell and Stanley Roundtree, both of whom observed Gregory after a controlled purchase. The State then inquired if Officer Yandell was aware of any "connections" between Powell, Roundtree, and defendant, to which Officer Yandell testified, "I know they're associated, just around the same age, but I don't know them to be personal friends."

¶ 28    On recross-examination, the following inquiry occurred:

"Q. [Y]ou said that all of these Mexican men, Hispanic men except for Octaviano Sanchez was in custody on the date of the murder. I don't have any reports whatsoever indicating that. Do you have a report that you've drafted that indicates that's true, and from what source you got it?

A. They're individual cases that I've done on these individuals. It's in Champaign Police Department records.

Q. Do you have those with you?

A. I do not.

Q. D[id] you provide them to [the State]?

A. I don't believe so."

The defense also inquired:

"Q. One last question about Octaviano Sanchez. You said he fled back to Mexico. What's the source of that knowledge?

A. It was through other confidential sources.

Q. Do you remember when that was that you learned that

information?

A. Within weeks of that investigation. Within a week of executing the warrant on Mittendorf, on Alberto Rodriguez, we learned that—well, that night we could not find Octaviano. We later learned within the week that he had fled back to Mexico.

Q. Some source told you he went back to Mexico?

A. Yes.

Q. Have you checked on whether or not he's ever returned?

A. I have not."

¶ 29 In closing, the State argued the jury should believe the accounts provided by Isaac and Jamerson—that defendant was the shooter. Conversely, the defense argued the jury should believe the account provided by McGill—that defendant was not the shooter. With respect to alternative suspects, the defense argued:

"If you want to talk about motive, everybody knew that Greg[ory] Moore was a snitch. Everybody knew in the hood. Back in the spring of 2008 Officer Yandell was so worried for his safety he sent Greg[ory] and Isaac out of town ***."

The defense further argued:

"Who had motives to kill? Who had motives to kill? Well, I don't want to go into it at length, because it will take too long, but a lot of people. Greg Moore set up a lot of people. He set up a lot of Hispanic men, and others. Some of those Hispanic men were busted, or their houses were busted and had thousands of dollars of drugs,

and guns, and cash seized. The officer says well, I think a lot of them were in custody at that time. I don't remember where, or when, or anything like that. It's odd.

But there's one he knows about who wasn't and that's Octaviano Sanchez. He's still out there, he's still out there. And that's important, because Amandrae McGill says it was either a black man or a Hispanic man that did it. It was Octaviano Sanchez's deal that Officer Yandell was so worried about Greg[ory], so very worried about him that he told Greg[ory], you've got to get out of town. So Sanchez has a motive. But who else has motives? Well, everybody else who Greg[ory] has set up.

I mean, think about Otis Powell. Otis Powell, there's a drug deal going on with Greg[ory] Moore at a business, right? And after the deal is done Greg[ory] gets in the car, and Officer Yandell and others are watching to make sure it all goes okay. And what happens? Two known drug dealers, including Otis Powell, start following Greg[ory]. And the police officers know who these guys are, they're drug dealers, and they're chasing Greg[ory]. And then they start chasing the officers.

And it's later that night or shortly after that that Otis Powell meets up with Greg[ory] Moore and Isaac Moore, and what does he do? Shoots them. Shoots them. Greg[ory] Moore has been shot before. Isaac Moore has been shot before. Otis Powell's a shooter.

The police do investigations and Isaac Moore doesn't really cooperate and says you know what? You know? I could have, you know, I didn't want him to go forward. I'll tell the cops whatever I want to tell the cops about it. What's that about? All I know is, it's a motive. Otis Powell wanted him dead once, I don't think that goes away.

So there are motives here for a lot of other people to want to injure or kill the Moores."

¶ 30 Following closing arguments, the jury found defendant guilty of both the first degree murder of Gregory and attempted first degree murder of Isaac. The trial court later sentenced defendant to consecutive terms of 53 years' and 32 years' imprisonment. Defendant appealed.

¶ 31 In 2012, this court affirmed defendant's convictions. *People v. Johnson*, 2012 IL App (4th) 090893-U. Both defendant's petition for leave to appeal to the Illinois Supreme Court and writ of *certiorari* with the United States Supreme Court were denied. *People v. Johnson*, 982 N.E.2d 772 (2013) (table) (denying petition for leave to appeal); *Johnson v. Illinois*, 134 S. Ct. 358 (2013) (denying petition for a writ of *certiorari*).

¶ 32 In 2014, defendant, with the assistance of private counsel, filed a postconviction petition. After the circuit court summarily dismissed defendant's petition and a notice of appeal was filed, defendant filed a timely *pro se* motion to reconsider which alleged, in part, his postconviction counsel provided "ineffective" assistance by failing to raise certain, previously-requested claims in his postconviction petition. Defendant set forth several of the claims which he allegedly requested counsel to raise in his petition. Defendant also suggested there

were other claims he allegedly requested which were not set forth in his motion. The court declined to consider defendant's motion, believing it was without jurisdiction.

¶ 33        In 2016, this court granted an agreed motion for summary remand to allow the circuit court to consider defendant's motion to reconsider. On remand, defendant filed a *pro se* supplement to his motion to reconsider which alleged additional claims, including, *inter alia*, a claim that his trial counsel provided ineffective assistance by failing to object to portions of Officer Yandell's testimony which lacked a sufficient foundation and amounted to hearsay. The circuit court denied defendant's supplemented motion to reconsider. With respect to the *pro se* claims raised therein, the court found the claims were forfeited as they were not raised in the original petition, and defendant had not requested leave to file a successive postconviction petition. That is, the court did not consider the merits of any of the *pro se* claims or whether postconviction counsel should have included those claims in defendant's postconviction petition. Defendant appealed.

¶ 34        In 2017, defendant, before this court, argued the circuit court erred by not considering whether his postconviction counsel's representation was "unreasonable" for failing to include the *pro se* claims from his supplemented motion to reconsider in his postconviction petition and by summarily dismissing his petition because at least one of the claims he would have raised had counsel not provided unreasonable assistance stated the gist of a meritorious claim. *Johnson*, 2017 IL App (4th) 160449, ¶ 2. As a threshold issue, we considered whether prisoners were entitled to reasonable assistance at the first stage of postconviction proceedings. *Id.* ¶ 32. Based on the statutory language, the persuasive authority from our sister districts, and the absence of a clear ruling on the issue by the supreme court, we concluded a prisoner was not entitled to reasonable assistance at the first stage of postconviction proceedings. *Id.* ¶¶ 35-41. Accordingly,

- 14 -

we rejected defendant's arguments grounded in such an entitlement. *Id.* ¶ 43. Defendant filed a petition for leave to appeal, which the supreme court granted.

¶ 35 In 2018, defendant urged the supreme court to recognize a right to reasonable assistance of counsel at the first stage of postconviction proceedings. *Johnson*, 2018 IL 122227, ¶ 13. After reviewing the nature and purpose of the Act, the court recognized such a right. *Id.* ¶¶ 14-18. Accordingly, the court overruled the decision of this court and those decisions of our sister districts to the extent they held to the contrary. *Id.* ¶ 23. The court then remanded the matter to the circuit court for it to "reach the substance of defendant's supplemented motion to reconsider." *Id.* ¶ 24. The court instructed:

> "If the circuit court determines the claims raised in defendant's supplemented motion to reconsider are frivolous or patently without merit, then the failure to include those claims would not amount to a denial of reasonable assistance of counsel, and defendant would not be entitled to relief on his motion to reconsider. However, if the circuit court determines that one or more of the claims are not frivolous or patently without merit and if the court determines that defendant's attorney was aware of such claims and refused to include them, then defendant should be permitted to amend his petition with the claims and proceed to the second stage of postconviction proceedings." *Id.*

¶ 36 On remand, defendant filed a second *pro se* supplement to his motion to reconsider which alleged additional claims, including, *inter alia*, a claim that his appellate counsel provided ineffective assistance by failing to raise under the first prong of the plain-error doctrine a violation

of Rule 431(b) and a claim that the State violated his right to due process when it knowingly used Officer Yandell's false testimony to obtain his convictions. With respect to the latter claim, defendant alleged Officer Yandell's testimony that Alvarado was in custody on the date of Gregory's death was false. In support of that allegation, defendant attached various exhibits to his supplement which indicated (1) no records existed of Alvarado being in the Champaign County jail on the date Gregory was killed and (2) Alvarado did "not appear in the Criminal or Civil Indices of the U.S. Clerk's Office in Urbana, Illinois." The circuit court, after concluding each of the *pro se* claims were meritless, again denied the supplemented motion to reconsider.

¶ 37        This appeal followed.

¶ 38                             II. ANALYSIS

¶ 39        On appeal, defendant argues this court should reverse and remand for second-stage postconviction proceedings because he pleaded the gist of a constitutional claim that (1) his trial counsel provided ineffective assistance by failing to object to portions of Officer Yandell's testimony which lacked a sufficient foundation and amounted to hearsay, (2) his appellate counsel provided ineffective assistance by failing to raise under the first prong of the plain-error doctrine a violation of Rule 431(b), and (3) the State violated his right to due process when it knowingly used Officer Yandell's false testimony to obtain his convictions.

¶ 40                A. Alleged Ineffective Assistance of Trial Counsel

¶ 41        Defendant asserts he pleaded the gist of a constitutional claim that his trial counsel provided ineffective assistance by failing to object to portions of Officer Yandell's testimony which lacked a sufficient foundation and amounted to hearsay.

¶ 42        A defendant who claims trial counsel was ineffective for failing to object to certain testimony at trial must allege facts demonstrating such failure was objectively unreasonable and

- 16 -

prejudiced the defendant. *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908. At the first stage of postconviction proceedings, a defendant need only show "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009).

¶ 43        Defendant asserts his trial counsel arguably provided ineffective assistance by failing to object for lack of foundation to Officer Yandell's testimony that Baker, Garcia, Alvarado, Norberto, and Octaviano did not learn of Gregory's identify as an informant. We disagree. Even if the testimony was improper, we are unconvinced counsel's failure to object to the testimony arguably prejudiced defendant given the other testimony and argument presented. Officer Yandell testified, to his knowledge, Baker, Garcia, Alvarado, Norberto, and Octaviano never learned Gregory's identity as an informant. While Officer Yandell may not have been aware of those men learning Gregory's identity, he also testified Gregory's "name had gotten out on the street in the drug community as working for the police." In fact, Officer Yandell acknowledged at one point he was so concerned with Gregory and Isaac's safety that he provided police funds to assist with their relocation. In closing, the defense argued, regardless of Officer Yandell not being aware of Baker, Garcia, Alvarado, Norberto, and Octaviano learning Gregory's identity, Gregory's identity as an informant was well known in the drug community, so much so that Officer Yandell assisted in relocating Gregory and Isaac for their safety. Because defendant was not arguably prejudiced by his counsel's performance, his claim of ineffective assistance is frivolous and patently without merit.

¶ 44        Defendant asserts his trial counsel arguably provided ineffective assistance by failing to object for lack of foundation to Officer Yandell's testimony that Baker, Garcia, Alvarado,

- 17 -

and Norberto were in custody of a law enforcement agency at the time Gregory was killed. We disagree. Even if the testimony was improper, we are unconvinced counsel's failure to object to the testimony arguably prejudiced defendant given the other testimony and argument presented. Officer Yandell later testified to being aware Baker, Garcia, Alvarado, and Norberto were in custody at the time Gregory was killed from the individual cases in which he was involved. In fact, Officer Yandell testified that information could be found in the Champaign Police Department records. In closing, the defense argued, given the lack of detail provided by Officer Yandell concerning the alleged custody, Baker, Garcia, Alvarado, and Norberto, those men may have still committed the crimes against Gregory and Isaac. Because defendant was not arguably prejudiced by his counsel's performance, his claim of ineffective assistance is frivolous and patently without merit.

¶ 45        Defendant asserts his trial counsel arguably provided ineffective assistance by failing to object for lack of foundation to Officer Yandell's testimony that defendant was associated with two individuals who learned Gregory's identity as an informant, Powell and Roundtree. We disagree. Even if the testimony was improper, we are unconvinced counsel's failure to object to the testimony arguably prejudiced defendant given the information it introduced. After being asked if he was aware of any "connections" between Powell, Roundtree, and defendant, Officer Yandell testified, "I know they're associated, just around the same age, but I don't know them to be personal friends." That is, Officer Yandell qualified the association as being related to the age of the three men. Without more, we are unconvinced the testimony was arguably prejudicial. Because defendant was not arguably prejudiced by his counsel's performance, his claim of ineffective assistance is frivolous and patently without merit.

¶ 46 Defendant asserts his trial counsel arguably provided ineffective assistance by failing to object as hearsay to Officer Yandell's testimony that Octaviano fled to Mexico. We disagree. Even if the testimony was improper, we are unconvinced counsel's failure to object to the testimony arguably prejudiced defendant given the other testimony and argument presented. Officer Yandell later acknowledged he was not aware whether Octaviano returned from Mexico. In closing, the defense argued, given the fact Octaviano may have returned from Mexico, he may have committed the crimes against Gregory and Isaac. Because defendant was not arguably prejudiced by his counsel's performance, his claim of ineffective assistance is frivolous and patently without merit.

¶ 47 Ultimately, despite the fact the complained-of testimony was not introduced at defendant's first two trials, the defense was still able to present the alternative suspects to support its theory of the case. We find the complained-of testimony, either individually or cumulatively, did not arguably prejudice defendant. Because defendant was not arguably prejudiced by his counsel's performance, his claim of ineffective assistance is frivolous and patently without merit.

¶ 48 B. Alleged Ineffective Assistance of Appellate Counsel

¶ 49 Defendant asserts he pleaded the gist of a constitutional claim that his appellate counsel provided ineffective assistance by failing to raise under the first prong of the plain-error doctrine a violation of Rule 431(b).

¶ 50 A defendant who claims appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such failure was objectively unreasonable and prejudiced the defendant. *People v. English*, 2013 IL 112890, ¶ 33, 987 N.E.2d 371. Again, at the first stage of postconviction proceedings, a defendant need only show "(i) it is arguable

that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 51 Appellate counsel is not obligated to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues which in counsel's judgment are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1107 (2000). Appellate counsel's assessment of the merits of an issue depends on the state of the law at the time of the appeal. *English*, 2013 IL 112890, ¶ 34.

¶ 52 The State does not dispute the law at the time of defendant's direct appeal established it was error for a trial court to not ask potential jurors whether they accepted the Rule 431(b) principles during *voir dire*. See Ill. S. Ct. R. 431(b) (eff. May 1, 2007) ("[t]he court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" the principles set forth in the rule); *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 410 (2010) (finding a trial court violated Rule 431(b) where it did not ask prospective jurors whether they accepted a principle set forth in the rule). Instead, the State contends defendant's appellate counsel did not arguably provide ineffective assistance for failing to raise the issue under the first prong of the plain-error doctrine because the evidence of defendant's guilt was "overwhelming."

¶ 53 Under the first prong of the plain-error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error where a clear or obvious error occurred and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error ***." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007). This case turned on the identity of the shooter. Both Isaac and Jamerson identified defendant as the shooter. However, both witnesses had prior inconsistent statements as to the identity of the shooter. Conversely, McGill

unequivocally identified defendant as not being the shooter. Ultimately, the jury was presented with a contest of credibility between the witnesses. In resolving that conflict, the jury also had before it significant evidence of alternative suspects who had a motive to shoot Gregory.

¶ 54        As defendant argues, we find appellate counsel arguably provided ineffective assistance by failing to raise under the first prong of the plain-error doctrine a violation of Rule 431(b). Accordingly, defendant's claim, contrary to the finding of the trial court, is neither frivolous nor patently without merit.

¶ 55                              C. Alleged Due Process Violation

¶ 56        Defendant asserts he pleaded the gist of a constitutional claim that the State violated his right to due process when it knowingly used Officer Yandell's false testimony to obtain his convictions.

¶ 57        "It is well established that the State's knowing use of perjured testimony in order to obtain a criminal conviction constitutes a violation of due process of law." *People v. Simpson*, 204 Ill. 2d 536, 552, 792 N.E.2d 265, 278 (2001). A conviction obtained by the knowing use of perjured testimony must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Internal quotation marks omitted.) *People v. Lucas*, 203 Ill. 2d 410, 422, 787 N.E.2d 113, 121 (2002).

¶ 58        Defendant complains the State knowingly used Officer Yandell's false testimony that Alvarado was in custody at the time Gregory was killed. To support his allegation that Officer Yandell's testimony was false, defendant attached records indicating Alvarado was not housed in the Champaign County jail on the date Gregory was killed and did not appear, on some unspecified date, "in the Criminal or Civil Indices of the U.S. Clerk's Office in Urbana, Illinois." These exhibits do not, however, indicate Officer Yandell's testimony that Alvarado was in the custody

- 21 -

of a law enforcement agency on the date Gregory was killed was false. Without any factual support, defendant's claim is frivolous and patently without merit.

¶ 59 In reaching this decision, we note defendant, on appeal, also attempts to rely on Officer Yandell's testimony from his first trial as factual support. During defendant's first trial, Officer Yandell provided testimony concerning Gregory's participation in several controlled purchases from Alvarado. After discussing Gregory's participation, the following inquiry occurred:

> "Q. You did not arrest or to your knowledge Edmundo
>
> Alvarado was never arrested, is that correct?
>
> A. That is correct.
>
> Q. And, in fact, recently didn't you even request that that
>
> investigation be closed because the confidential source, Mr. Moore,
>
> was deceased?
>
> A. That's correct."

Setting aside the fact a claim based on this testimony would have been available at the time of defendant's direct appeal, we are unconvinced it supports defendant's claim. In context, Officer Yandell's testimony indicating Alvarado was "never arrested" related to an arrest in the case in which Gregory assisted. It does not support defendant's claim suggesting Officer Yandell's testimony that Alvarado was in custody of a law enforcement agency on the date Gregory was killed was false.

¶ 60 D. Requested Relief

¶ 61 While we agree with defendant that, contrary to the finding of the trial court, he set forth the gist of a constitutional claim that his appellate counsel provided ineffective assistance by

failing to raise under the first prong of the plain-error doctrine a violation of Rule 431(b), we disagree with his suggestion the appropriate relief would be to reverse and remand for second-stage postconviction proceedings.

¶ 62        Defendant did not set forth his claim in his postconviction petition. Rather, he presented it in his supplemented motion to reconsider to support his assertion that his postconviction counsel provided unreasonable assistance. The supreme court made clear in its directions to the circuit court that even if the circuit court determined one of defendant's claims in his supplemented motion to reconsider was neither frivolous nor patently without merit, that determination, by itself, would not warrant advancement to the second-stage of postconviction proceedings. *Johnson*, 2018 IL 122227, ¶ 24. Rather, advancement would be warranted only if the circuit court also determined defendant's postconviction counsel was aware of the claim and refused to include it in defendant's postconviction petition. *Id.*

¶ 63        Because the circuit court found all of defendant's *pro se* claims were meritless, it stopped short of determining whether defendant's postconviction counsel was aware of the claims and refused to include them. We find, consistent with the supreme court's directions, we must remand to the circuit court for further first-stage postconviction proceedings where the circuit court can determine whether defendant's postconviction counsel was aware of defendant's claim that his appellate counsel provided ineffective assistance by failing to raise under the first prong of the plain-error doctrine a violation of Rule 431(b) and refused to include it in defendant's postconviction petition. If the circuit court determines postconviction counsel was aware of defendant's claim and refused to include it in defendant's postconviction petition, then defendant should be permitted to amend his petition with the claim and proceed to the second stage of postconviction proceedings. See *id.*

¶ 64                                                 III. CONCLUSION

¶ 65                We reverse and remand for further first-stage postconviction proceedings.

¶ 66                Reversed and remanded.